[No. S004370, Crim. No. 22032. July 28, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT CRUZ McLAIN, Defendant and Appellant.

102

**COUNSEL**

James M. Hallett, under appointment by the Supreme Court, and Tim Foley for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Alan Hart, Robert F. Katz, Gary R. Hahn, Thomas Willhite and Susanne C. Wylie, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—This is an automatic appeal from a judgment of death (Pen. Code, § 1239, subd. (b)) imposed under the 1978 death penalty law (*id.,* § 190.1 et seq.).

Defendant was convicted on a jury's verdict of the following offenses committed on or about November 7, 1979: the murder (Pen. Code, § 187) and rape (*id.,* § 261, subd. (2)) of Joni Donnell Kelley, and conspiracy to commit that murder (*id.,* §§ 182, 187) and that rape (*id.,* §§ 182, 261, subd.

(2)); and the attempted murder (*id.,* §§ 187, 664) and attempted rape (*id.,* §§ 261, subd. (2), 664) of Jodi W., conspiracy to rape Jodi W. (*id.,* §§ 182, 261, subd. (2)), and the attempted burglary of Jodi W.'s residence (*id.,* §§ 459, 664) and conspiracy to burglarize that residence (*id.,* §§ 182, 459). Defendant was found guilty by the jury of murdering Kelley in the course of the rape. (*Id.,* § 190.2, subd. (a)(17)(iii).) After waiving a jury determination of the issue, he was found by the court to have been convicted on July 11, 1980, of the November 11, 1979, murder of Diana Bazargani in Solano County case No. 13915. (*Id.,* § 190.2, subd. (a)(2).) He had admitted prior conviction of 11 felonies, 10 of which involved violence, 8 of those being sex crimes. The jury subsequently fixed the penalty at death.

As we shall explain, we conclude that the judgment must be affirmed.

## I. FACTS

In November 1979 defendant drove with his nephew, Teddy Willis, and defendant's friend, Lloyd Ketcherside, from Northern California to Ventura County. At that time defendant was about 40 years old, Ketcherside was about 16, and Willis was evidently about the same age. Defendant made the trip, at least in part, to locate Jodi W., whom he had been convicted of raping in 1971 when she was 11 years old. Arriving in Ventura County, the trio soon found Jodi W.'s residence. While attempting to enter through a window, they heard someone approaching and fled the scene.

As they were driving around town, the three spotted a young woman hitchhiking and circled the block to pick her up. The hitchhiker—later identified as Joni Kelley—was subsequently raped and shot to death, and her body was left at a garbage dump.

The trio returned to Solano County. After their return, Diana Bazargani was killed and the three were arrested in connection with the crime. During the investigation of the Bazargani killing, the authorities learned of the trio's activities in Ventura County.

The prosecution sought to prove that defendant had gone to Ventura County to exact vengeance on Jodi W. for her part in his conviction for the 1971 rape, and that when he failed in his attempt he participated in the rape and killing of Kelley.

Ketcherside testified under a grant of immunity as follows. Defendant told him that he wanted to go to Ventura County to do to Jodi W. what she had claimed he had done several years ago. After the trio failed in their attempt to find Jodi W., they picked up Kelley. Sensing the impending

violence, Ketcherside asked to be left on a beach while defendant and Willis did their dirty work. When defendant and Willis returned, they were without Kelley. They remarked she had given them pleasure and said they regretted having to kill her.

Three of defendant's former cellmates testified he said he had gone to Ventura to find the woman he held responsible for a prior conviction, and that he picked up and raped another woman and subsequently shot her.

The prosecution also introduced physical evidence, including certain of Kelley's belongings that were found on defendant's person and in his automobile, and a rifle in defendant's possession that was linked to the murder.

The defense attempted to show that defendant had not participated in the crimes committed in Ventura County. Defendant took the witness stand. He stated that he had wanted to locate Jodi W. to persuade her to sign what he referred to as a "deposition" to the effect that she had wrongfully accused him of rape. He denied that he had ever seen Kelley, but stated that Willis and Ketcherside went off for a few hours by themselves on the day of the murder. One of defendant's acquaintances testified that Ketcherside said he would try to exculpate himself by placing the blame for the killing on defendant and Willis.

At the penalty phase, the prosecution introduced, inter alia, evidence of several of defendant's 11 prior felony convictions and of the facts underlying those convictions, including the rape of Jodi W. and the murder of Bazargani. The defense presented evidence that defendant had a difficult childhood and suffered from narcissistic personality disorder and antisocial personality disorder, but had been kind and helpful to relatives and friends and had behaved well during his time in prison. Defendant himself testified about his background, and denied that he committed any crimes against Jodi W., Kelley, or Bazargani.

## II.  Guilt Issues

Defendant makes four claims of error going to the judgment of guilt. As we shall show, none requires reversal.

### A.  *Motion to Sever*

■ Defendant's first contention is that the court prejudicially erred in denying a motion he had made for severance of the Kelley and Jodi W. counts. For argument's sake we shall agree that the court committed error. But we simply cannot agree that any such error was prejudicial under

*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. As to the Jodi W. offenses, it is not reasonably probable·that a jury in a severed trial would find that defendant was not a direct participant in the crimes: his companions had no motive to drive hundreds of miles to find the woman who as a child had helped send defendant to prison. As to the Kelley crimes our conclusion is similar: in view of the evidence adduced at trial, it is not reasonably probable that a jury in a severed trial would find that defendant did not sufficiently participate in the events of November 7, 1979, to warrant conviction for the rape and murder of Kelley. We do not discount the significant power such crimes as those charged here have to inflame the passions of a jury. Nevertheless, in view of the strength of the evidence relating to each group of charges, we cannot conclude that it is reasonably probable an outcome more favorable to defendant would have resulted if his severance motion had been granted.

B. *"Death Qualification" and the Fair Cross-section Requirement*

■ Defendant contends that the "death qualification" of the jury prior to the guilt phase of his trial violated his right to a jury drawn from a fair cross-section of the community. The point was rejected by this court in *People* v. *Fields* (1983) 35 Cal.3d 329 [197 Cal.Rptr. 803, 673 P.2d 680], 342-352 (plur. opn.), 374-375 (conc. opn. of Kaus, J.), and by the United States Supreme Court in *Lockhart* v. *McCree* (1986) 476 U.S. 162, 173-177 [90 L.Ed.2d 137, 147-150, 106 S.Ct. 1758].

C. *Instructions on Accomplice Testimony*

■ Defendant contends the court erred by failing to instruct the jury that Ketcherside was an accomplice in the crimes against Kelley as a matter of law.

Penal Code section 1111 defines an accomplice as a person "who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." ■ This definition encompasses all principals to the crime (*People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335]), including aiders and abetters and coconspirators (*People* v. *Gordon* (1973) 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298]). Whether a person is an accomplice is a question of fact for the jury, unless there is no dispute as to either the facts or the inferences to be drawn from them. (*People* v. *Hoover* (1974) 12 Cal.3d 875, 880 [117 Cal.Rptr. 672, 528 P.2d 760]; *People* v. *Gordon, supra,* at p. 467.)

It was a question for the jury whether Ketcherside was an accomplice in the crimes against Kelley. Ketcherside testified that defendant and Willis

left him on a beach while they did their dirty work. To be sure, the claim seems improbable: as the prosecutor himself stated in closing argument, "any rational person who had a healthy amount of cynicism and skepticism would be suspicious of that story." Nonetheless, an improbable tale is not an impossible tale. ██ The jury, therefore, could have credited Ketcherside's testimony and found that he was not involved in the rape and murder of Kelley. Accordingly, the court did not err by failing to instruct the jury that Ketcherside was an accomplice in these crimes as a matter of law.

### D. *Failure to Give Instructions Sua Sponte on the Reliability of Informer Testimony*

██ Defendant contends the court erred by failing to instruct the jurors sua sponte that they should consider an informer's testimony to be inherently unreliable and should view such testimony with suspicion. We recently held to the contrary. (*People* v. *Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776].)

### III. SPECIAL CIRCUMSTANCE ISSUES

Defendant attacks the validity of both the special circumstances found in this case: felony murder-rape and prior murder conviction. For the reasons given below, we conclude that his attack is unsuccessful.

### A. *The Felony-murder Special Circumstance and Intent to Kill*

██ Defendant contends the felony-murder special-circumstance finding must be vacated on the ground that the court improperly instructed the jury on intent to kill. Specifically, he argues that contrary to our holding in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1147 [240 Cal.Rptr. 585, 742 P.2d 1306], the instruction failed to inform the jurors that if they determined he was not the actual killer they were required to find that he acted with intent to kill. In *People* v. *Warren* (1988) 45 Cal.3d 471, 486-488 [247 Cal.Rptr. 172, 754 P.2d 218], we concluded that an instruction similar to that given here was adequate. Hence we reject defendant's point.

### B. *The Prior-murder-conviction Special Circumstance*

#### 1. *Temporal Requirements*

██ Defendant contends that the prior-murder-conviction special-circumstance finding must be vacated on the ground that this special circum-

stance requires the commission of and conviction for a murder antedating the commission of the present capital offense—a situation not present here. We rejected this very point in *People* v. *Hendricks* (1987) 43 Cal.3d 584, 595-596 [238 Cal.Rptr. 66, 737 P.2d 1350].

### 2. *Intent to Kill*

■ Defendant contends that the prior-murder-conviction special-circumstance finding must be vacated on the ground that intent to kill is an element of this special circumstance, but was not instructed on by the court or found by the jury. We rejected this point as well in *People* v. *Hendricks, supra,* 43 Cal.3d at page 596.

### IV. PENALTY ISSUES

Defendant makes several claims of prejudicial penalty error. As we shall explain, none is meritorious.

### A. *Issues Relating to Evidentiary Rulings*

■ Defendant first complains of an order barring proposed testimony by Dr. Dean J. Clair, a prison psychologist, who would apparently have summarized certain prison records and concluded that defendant's behavior in confinement had been good.

At the threshold the court ruled that the defense might "show the defendant's past [prison] performance and present [prison performance] on the relevant issue of background . . . ." The parties, however, disputed whether Dr. Clair's opinion and the records on which it was based were supported by an adequate evidentiary foundation for admission. Eventually, however, they settled their dispute in its entirety by waiving foundational requirements for certain prison records and thereby withdrew the issue from the court's consideration. It is true that Dr. Clair did not testify concerning defendant's past behavior in prison or any other matter. But his failure to do so was attributable solely to a decision on the part of the defense and not to any order by the court. Accordingly, we reject the claim of error.

■ Defendant next complains of a ruling barring evidence to show that his future behavior in prison would be good. The ruling was erroneous. In *Skipper* v. *South Carolina* (1986) 476 U.S. 1 [90 L.Ed.2d 1, 106 S.Ct. 1669], the United States Supreme Court held: "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating. Under *Eddings* [v. *Oklahoma,* 455 U.S. 104 (1982)

(71 L.Ed.2d 1, 102 S.Ct. 869)], such evidence may not be excluded from the sentencer's consideration." (476 U.S. at p. 5 [90 L.Ed.2d at p. 7], fn. omitted.)

The Attorney General attempts to characterize the ruling as a narrow and proper determination barring as incompetent Dr. Clair's proposed expert testimony on defendant's future behavior. The record, however, is otherwise. The court's words are clear: "It would be the intent of the Court to prevent the prosecution to show any future crimes in prison, and in light of that position of the Court, it seems to be it would then be inappropriate for the defense to show the unlikelihood of committing future crimes in or out of prison."

We must now decide whether the error requires reversal. As we recently held in *People* v. *Lucero* (1988) 44 Cal.3d 1006, 1031-1032 [245 Cal.Rptr. 185, 750 P.2d 1342], *Skipper* error is subject to review under the beyond-a-reasonable-doubt test of *Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Accordingly, we apply that test here. Dr. Clair would apparently have testified to the effect that, in the words of *Skipper*, "defendant would not pose a danger if spared (but incarcerated) . . . ." (476 U.S. at p. 5 [90 L.Ed.2d at p. 7].) We shall assume arguendo that expert predictions that persons will not commit future acts of violence are admissible at the penalty phase. (But cf. *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 767 [175 Cal.Rptr. 738, 631 P.2d 446] [holding inadmissible "expert predictions that persons *will* commit future acts of violence" (italics added)].) Although we do not discount the potentially mitigating effect of testimony that a defendant would not pose a danger if sentenced to prison, on this record the ruling barring such testimony was not prejudicial. The evidence in aggravation was overwhelming and the evidence in mitigation was minimal. Further, the improperly excluded testimony would have had no marginal effect on the balance of aggravating and mitigating factors. Accordingly, we conclude that the error was harmless beyond a reasonable doubt.[1]

---

[1]Defendant requests that pursuant to Evidence Code sections 452, subdivision (d), and 459, we take judicial notice of Dr. Clair's testimony on his future good behavior at the penalty phase of his trial for the murder of Bazargani in Solano County case No. 13915, which is contained in the record on appeal in *People* v. *McLain*, A013511, appeal pending, in order to determine whether the erroneous ruling herein was prejudicial. We decline to do so: Dr. Clair's testimony in the Solano County action is irrelevant in this proceeding. Our conclusion might have been different if defense counsel had expressly or impliedly incorporated that testimony into an offer of proof as to how Dr. Clair would testify at the penalty phase here, but he did not do so.

We recognize, as the Attorney General urges, that a defense psychologist did opine that defendant "would be able to be active [in prison], being able to become involved in work or hobbies or activities and the time would go by quickly and he would adjust well." But in its

■ Defendant also complains of the admission of (1) testimony by a former friend that in 1971 defendant remarked that the restroom in a certain church in Ventura would be a good place to commit rape; (2) testimony by another former friend that in 1971 defendant asked him to accompany him to Santa Barbara to commit rape; (3) testimony by the same person that following his arrest in that same year for the rape of Jodi W. defendant attempted to enlist his aid in a nonviolent attempt to escape from jail; (4) a letter written by defendant in jail before commencement of trial in this matter stating, "Well, I have made up my mind, I tried to do good while I was out there, but next time I get out I'll not try to do right"; (5) testimony by a deputy sheriff that apparently not long before trial began defendant said that under certain circumstances he would shoot a police officer; and (6) testimony by another deputy sheriff that after trial began defendant said he would make an escape and the escape would not be nonviolent.

The admission of the six items, whether considered separately or together, did not amount to error requiring reversal. We shall assume arguendo that the claim is preserved for review. We also assume that each of the items was inadmissible under *People* v. *Boyd* (1985) 38 Cal.3d 762, 772-776 [215 Cal.Rptr. 1, 700 P.2d 782], as irrelevant to any of the sentencing factors specified in Penal Code section 190.3 (hereafter section 190.3): each appears irrelevant to the only factor potentially available—"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence"—since each seems either noncriminal or nonviolent or both.

But even if error was committed, it was nonprejudicial. Again, the evidence in aggravation was overwhelming and the evidence in mitigation was minimal, and the evidence claimed to have been improperly admitted would have had no marginal effect on the balance of aggravating and mitigating factors. We conclude that the error, if such it be, would have been harmless under any standard.

■ Finally, defendant complains of the admission of evidence relating to the facts underlying several of his prior felony convictions. He argues that when as here evidence of the *convictions* has been introduced, evidence of the *facts* should not be admitted. In *People* v. *Gates* (1987) 43 Cal.3d 1168, 1203 [240 Cal.Rptr. 666, 743 P.2d 301], however, we found a similar argument wanting.

context such testimony was so insignificant that we have not taken it into account in our prejudice analysis.

B. *Issues Relating to Prosecutorial Misconduct*

Defendant makes three claims relating to misconduct on the part of the prosecutor. In closing argument, which was long and vigorous, the prosecutor first reviewed the evidence and its application to the sentencing factors and then, after defense counsel had given the opening part of their argument, spoke in rebuttal. The theme of the prosecutor's argument, repeated time and again, was that death was the appropriate penalty because the evidence in aggravation was overwhelming and the evidence in mitigation virtually nonexistent.

Defendant first complains of a comment by the prosecutor relating to an instruction pursuant to factor (i) of section 190.3—"The age of the defendant at the time of the crime."[2] The remark in question was as follows. "The defendant's age: You know, I think it's fair to assume that the reason that factor is in there and what is meant by that is other things being equal, the younger the person, the more extenuating the crime. . . . The older he is and the more he's done and the more chances he's had and the more he's shown a disinclination to reform or change, the more the age factor counts against him. [¶] And we are dealing here with a guy who is 41, who's had lots of chances, who's had lots of opportunities, and whose attitude is, as he expressed in the letter, the next time out, if he would have had a next time out, he's not going to try to do it right. [¶] So that factor is certainly a minus for him."

Defendant claims that the prosecutor's comment constituted a misstatement of the law: factor (i), he asserts, was intended to be a factor in mitigation and not a factor in aggravation. He is incorrect. In *People* v. *Lucky* (1988) 45 Cal.3d 259 [247 Cal.Rptr. 1, 753 P.2d 1052], we held that "the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*Id.* at p. 302.) We further declared that "either counsel may argue any such age-related inference in every case." (*Ibid.*) It is plain that under *Lucky* the prosecutor's remark was not improper.

Defendant also complains of several comments by the prosecutor to the effect that "He doesn't have the slightest remorse for anything he's

---

[2] At both the guilt and penalty phases of the trial, the court orally instructed the jurors and then sent the instructions in written form into the jury room for use during deliberation. Unless otherwise noted, the oral and written versions of the instructions referred to herein are not significantly different. We presume that the jurors were guided by the written version and quote therefrom unless we state otherwise.

done." ■■ A prosecutor, however, may properly argue that remorse—which is universally held to be evidence in mitigation—is lacking in a particular capital case. (*People* v. *Ghent* (1987) 43 Cal.3d 739, 771 [239 Cal.Rptr. 82, 739 P.2d 1250] [decided under relevantly similar 1977 death penalty law].)

■■ Finally, defendant claims the court erred by denying a motion for mistrial he made in response to a comment by the prosecutor. While reviewing the evidence the prosecutor discussed the testimony of one Lonnie Chatman, a prison acquaintance called by the defense at the penalty phase to corroborate defendant's story about the so-called "deposition" he assertedly wanted Jodi W. to sign. The gravamen of the prosecutor's remarks was to the effect that Chatman's tale was unworthy of belief and indeed intentionally false: Chatman had a motive to lie—to help a prison acquaintance and thwart the prosecution—and told a story that was inconsistent with itself and with other evidence. Speaking on the inconsistencies and their cause, the prosecutor made the comment under challenge: "So obviously what happened, [defense investigators] shopped around, found somebody who was willing to come in and lie, but they didn't get his story straight enough . . . ." Defense counsel objected, the court sustained the objection and directed the prosecutor to proceed, and the prosecutor soon ended his discussion of Chatman's testimony and continued his review of the evidence.

Outside the presence of the jury, defense counsel moved for a mistrial based on the prosecutor's comment. Although the prosecutor denied he meant to imply that the defense intentionally presented perjured testimony, the court determined that the comment was improper. Impliedly concluding that an admonition would cure the harm, the court decided to deliver such a statement, directed defense counsel to provide a draft, and denied the motion for mistrial. Subsequently, at the request of defense counsel, the court told the jury that the comment in question might have been subject to an inference that the defense countenanced false testimony, but "You are admonished that no such inference was intended by the prosecution. You are further admonished that the defense has not in any way so conducted itself. You are the sole judges of the credibility of all witnesses who testify in this case. Counsel may argue to you the issue of the credibility of any witness."

Immediately after the admonition the prosecutor renounced the implication of his comment, saying, "I didn't mean to suggest that anyone connected with the defense suggested that he lie or encouraged him to do so or knowingly promote[d] his false testimony, and I am sure that no one connected with the defense did do that or would do that."

We turn now to defendant's claim that the court erred by denying his motion for mistrial. In reviewing rulings on such motions, we apply the deferential abuse-of-discretion standard. (See *People v. Superior Court (Thomas)* (1967) 67 Cal.2d 929, 932 [64 Cal.Rptr. 327, 434 P.2d 623, 25 A.L.R.3d 1143].) Under that standard, we find no error. We recognize, as did the trial court, that the prosecutor's comment was improper. (See, e.g., *People v. Bain* (1971) 5 Cal.3d 839, 847 [97 Cal.Rptr. 684, 489 P.2d 564].) We cannot conclude, however, that an admonition was incapable of curing any ensuing harm. Whereas the prosecutor's argument was long, the comment was brief and went to a matter that was relatively insignificant in the determination of the issue of penalty. And contrary to defendant's claim, the admonition given was sufficient to prevent the harm.

## C. *Nonviolent Escape Attempt*

■ Defendant contends the court committed instructional error as to evidence of a nonviolent escape attempt introduced at the guilt phase. His argument is as follows: In the penalty phase the court instructed the jurors that "In determining which penalty is to be imposed on the defendant, you should consider all of the evidence which has been received during any part of the trial in this case"; that evidence included the nonviolent escape attempt; such evidence, however, was not relevant to any of the sentencing factors; accordingly, the court should have instructed the jurors sua sponte not to take it into account in fixing the penalty. We reject the point. Generally, a trial court is under no duty to instruct on the limited admissibility of evidence of past criminal conduct in the absence of a request. (E.g., *People v. Collie* (1981) 30 Cal.3d 43, 63 [177 Cal.Rptr. 458, 634 P.2d 534, 23 A.L.R.4th 776].) Defendant fails to show this rule is not applicable here.

## D. *Easley "Factor (k)" Error*

■ Defendant contends the language of factor (k) of the instruction given pursuant to former CALJIC No. 8.84.1 (hereafter former factor (k)) may have misled the jurors to his prejudice about the scope of their sentencing discretion and responsibility under the Constitution, and may also have misled them about the evidence they might consider in exercising that discretion and responsibility. In accordance with former CALJIC No. 8.84.1 as modified, the court instructed the jurors that in determining penalty they should consider several specified circumstances and also "(k) Any other circumstance which extenuates or mitigates the gravity of the crime even though it is not a legal excuse for the crime."

In *People v. Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we concluded at pages 877 to 878 that the language of former factor

(k)—with its exclusive focus on "the crime" and not "the criminal"—might mislead jurors about the scope of their responsibility under the federal Constitution and about the evidence they might consider in exercising that responsibility. We observed at the same pages that in *Lockett* v. *Ohio* (1978) 438 U.S. 586 [57 L.Ed.2d 973, 98 S.Ct. 2954], and *Eddings* v. *Oklahoma* (1982) 455 U.S. 104 [71 L.Ed.2d 1, 102 S.Ct. 869], the United States Supreme Court held that the trier of fact may "not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death" (*Lockett, supra,* 438 U.S. at p. 604 [57 L.Ed.2d at p. 990], italics in original (plur. opn. by Burger, C.J.); accord, *Eddings, supra,* 455 U.S. at p. 110 [71 L.Ed.2d at p. 8]).

In this case, the court must be held to have instructed the jury pursuant to the potentially misleading language of former factor (k). It is true that the court modified the standard instruction by adding the words "or mitigates" between "extenuates" and "the gravity of the crime." That modification, however, is of no relevance here: it does not change the instruction's exclusive focus on the crime and hence does not direct the jurors to consider the criminal and his background and character as well.

Nevertheless, we cannot conclude that the potentially misleading language of former factor (k) was misleading on this record. The court expressly told the jurors they should consider the evidence introduced going to defendant's background and character. Specifically, it modified as follows the opening paragraph of the standard version of former CALJIC No. 8.84.1: "In determining which penalty is to be imposed on the defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, *including, but not limited to, the defendant's character, background, history, mental and physical condition and matters relating to sentence.*" (Italics added.) In the context of the charge as a whole and of the evidence adduced and the argument presented by counsel, the jurors would have understood this language to direct them to consider the criminal as well as the crime and to weigh defendant's background and character evidence in mitigation. Accordingly, we find no *Easley* "factor (k)" error.

### E. *Brown Error*

██ Defendant contends the instruction given pursuant to former CALJIC No. 8.84.2, which incorporated the mandatory sentencing language of section 190.3, may have misled the jurors to his prejudice as to the scope of their sentencing responsibility and discretion under the Constitution as construed in our decision in *People* v. *Brown* (1985) 40 Cal.3d 512,

538-544 [220 Cal.Rptr. 637, 709 P.2d 440], reversed on other grounds *sub nomine California* v. *Brown* (1987) 479 U.S. 538 [107 S.Ct. 837 [93 L.Ed.2d 934, 107 S.Ct. 837]]. Section 190.3 states in relevant part that "the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, *and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances.*" (Italics added.)

In *Brown* we held that section 190.3, as construed therein, was not unconstitutional. (40 Cal.3d at pp. 538-544.) In conformity with settled constitutional principles, we interpreted the statutory language to require jurors to make an individualized moral assessment on the basis of the character of the defendant and the circumstances of the crime, and thereby decide which penalty is appropriate in the particular case. (*Id.* at pp. 540-541.)

Although in *Brown* we upheld the constitutionality of section 190.3, we nevertheless recognized that when delivered in an instruction the provision's mandatory sentencing language might mislead. (40 Cal.3d at p. 544, fn. 17.) We believed that a juror might reasonably understand that language to define the penalty determination as "simply a finding of facts" (*id.* at p. 540) or "a mere mechanical counting of factors on each side of the imaginary 'scale,'" (*id.* at p. 541). We also believed that a juror might reasonably understand the language to require him to vote for death if he finds that the evidence in aggravation outweighs the evidence in mitigation—even if he determines that death is not the appropriate penalty under all the circumstances. (See *id.* at pp. 540-544.)

Turning to the case at bar, we must determine at the threshold whether the court effectively instructed the jurors in the unadorned language of section 190.3. In the written instructions, which were sent into the jury room, the court used the mandatory sentencing language, including the word "shall." By contrast, in the oral instructions it replaced "shall" with "should." We are compelled to conclude that the court must be deemed to have instructed the jurors in the mandatory language. As stated above (fn. 2, *ante*), we presume the jury was guided by the written instructions. We find nothing to rebut that presumption here.

Nevertheless, after reviewing the record of the penalty phase in its entirety, we cannot conclude that the jurors may have been misled by the challenged instruction. Rather, we believe they were adequately informed of the scope of their sentencing responsibility and discretion under *Brown*.

Defendant argues in substance that the prosecutor's closing argument made the potentially misleading statutory language misleading in this case.

We are not persuaded. As noted above, the theme of the prosecutor's argument, repeated time and again, was that the evidence in aggravation was overwhelming and the evidence in mitigation was virtually nonexistent—and hence that the *evidence* called for the penalty of death. Such a theme, of course, does not offend the principles of *Brown*.

Further, in conformity with *Brown* the prosecutor emphasized that the "weighing" process was "not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them." (40 Cal.3d at p. 541.) He stated at one point: "You have got to go down as to each of the factors and consider them, weigh them, and determine whether the—which has the greater weight, the aggravating circumstances or the mitigating circumstances, assuming that you find some of each exists. [¶] Now, I think it's obviously not just a question of figuring out the number, although that would be a factor, also, because obviously there could be an aggravating factor on one hand and mitigating factor on the other, and they wouldn't necessarily be entitled to equal weight."

Moreover, after summarizing the evidence and discussing each of the sentencing factors, including what he referred to as "the additional consideration about [defendant's] character, his background, his history, his mental state," the prosecutor argued forcefully that death was the appropriate penalty *in this particular case*: "What is the appropriate penalty when you consider all of the extreme aggravating factors that you have in this case and the virtually total lack of any extenuating factors? It can only be a sentence of death. [¶] What other appropriate penalty can there be, when you consider the law and evidence . . . ?"

We recognize that at the beginning of his argument the prosecutor referred to the mandatory sentencing language: "But the standard that you will be told to go by is to weigh and consider circumstances in aggravation and circumstances in mitigation, and that if you decide that the aggravating circumstances outweigh the mitigating circumstances, then you must return a verdict of death. [¶] If you decide that the extenuating factors outweigh the factors in aggravation, then you are to return a verdict of life without possibility of parole."

Although we do not discount the potential effect of the foregoing comment, we do not believe the statutory language was misleading in this case: in context this remark was short, isolated, and unemphatic, appearing at the

beginning of the argument and not its end, and hence was swallowed up in the theme that the evidence called for the penalty of death.[3]

Defendant also argues that the court's response to certain questions asked by the jury during deliberations made the potentially misleading statutory language misleading in this case. The jury sent the court the following note: "Is there a definition of aggravation and mitigation that is available to us?" The court replied in writing: "Are you asking for the ordinary definition of those terms or whether there is a legal definition? If you are asking for the latter, there is no legal definition of these terms. They are to be given there [*sic*] commonly accepted and ordinary meaning." The jury then sent the court a note that read in relevant part: "Being unfamiliar with the term of mitigation we would like the dictionary meaning of both mitigation and aggravation, please." The court replied in writing: "Aggravation: An act or circumstance that makes more serious or more severe. [¶] Mitigation: An act or circumstance that makes less serious or less severe."

We fail to see how the court's response to the jury's questions could have made the potentially misleading statutory language misleading in this case. The response simply could not have been understood by a reasonable juror to refer in any way to the mandatory sentencing language. In conclusion, we find no *Brown* error.[4]

## F. *Guilt Phase "No Sympathy" Instruction*

■ Defendant contends the federal Constitution requires reversal of the judgment of death because the court instructed the jurors at the guilt phase that they "must not be swayed by mere sentiment, conjecture, sympa-

---

[3] Defendant directs our attention to a handful of other comments in the prosecutor's argument that he claims refer to the mandatory sentencing language. Having reviewed each of these remarks in its context, we are of the opinion that none would have been understood by a reasonable juror to contain such a reference. But even if they all could have been so understood, like the comment quoted above they too are short, isolated, and unemphatic.

[4] Defendant claims that the court's response to the jury's questions was inadequate and therefore erroneous. Specifically, he argues that the answer to the first question amounted to no answer at all, and that the answer to the second was deficient and indeed "sen[t] a clear message to the jury . . . that mitigating circumstances deserved no particular consideration." The point is without merit.

It may be that the answer to the first question was unduly limited: it correctly told the jurors that the words "aggravation" and "mitigation" were not used in the instructions in a technical sense, but were to be understood in accordance with their "commonly accepted and ordinary meaning"; it failed, however, to tell them what that "commonly accepted and ordinary meaning" was. But the answer to the second question was adequate and made up for whatever was lacking in the first. The short definitions it contained were not deficient, and certainly could not have been understood by a reasonable juror to say that mitigating circumstances deserved no consideration.

thy, passion, prejudice, public opinion or public feeling," and must be deemed to have incorporated the instruction into the penalty phase charge.

We shall assume the jurors understood that the "no sympathy" instruction applied to their penalty phase deliberations: in the jury room they had for their use a written copy of all the instructions given at both phases of the trial. We cannot agree, however, that the instruction was erroneous under the federal Constitution: the United States Supreme Court held in *California* v. *Brown, supra,* 479 U.S. 538 [107 S.Ct. 837], that charging a penalty phase jury in accordance with this instruction does not violate the Eighth and Fourteenth Amendments.

In reliance on Justice O'Connor's concurring opinion in *Brown,* defendant argues that the instruction may have misled the jurors "into believing that mitigating evidence about [his] background or character . . . must be ignored" (*California* v. *Brown, supra,* 479 U.S. at p. 545 [93 L.Ed.2d at p. 942, 107 S.Ct. at p. 842] (conc. opn. of O'Connor, J.)) because—he asserts—they were not adequately instructed that they could and should take such evidence into consideration. The argument must be rejected because, as we concluded above (see part IV D, *ante*), the jurors *did* receive proper instructions on background and character evidence.

### G. *Sentencing Factors*

■ Defendant contends the court erred by failing to label each of the CALJIC No. 8.84.1 sentencing factors as either aggravating or mitigating. He does not, however, persuade us that the court was under an obligation to do so in the absence of a request. He also contends the court erred by failing to delete factors inapplicable on the facts of the case. We recently rejected a similar contention. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

### H. *Ramos Error*

■ Defendant contends the court committed reversible error under *People* v. *Ramos* (1984) 37 Cal.3d 136 [207 Cal.Rptr. 800, 689 P.2d 430]. In accordance with former CALJIC No. 8.84.2, the court delivered the so-called Briggs Instruction: "You are instructed that under the state Constitution, a governor is empowered to grant a reprieve, pardon or commutation after sentence following conviction of a crime. Under this power a governor may in the future commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." In *People* v. *Ramos, supra,* 37 Cal.3d at page 153, we held that "the Briggs Instruction is incompatible with [the] guarantee of

'fundamental fairness' [established in the due process clauses of our Constitution (Cal. Const., art. I, §§ 7, 15)] both because it is seriously and prejudicially misleading and because it invites the jury to be influenced by speculative and improper considerations."

The Attorney General argues in substance that a supplementary charge, delivered by the court immediately after the Briggs Instruction, made that instruction nonerroneous or in any event nonprejudicial. That charge was as follows.

"You are further instructed, that such power by a governor to commute or modify a sentence is not to be considered by you in determining whether the defendant should be sentenced to death or life imprisonment without possibility of parole. You may not speculate as to if, or when, a commutation or modification would or would not be granted to the defendant. It is not your function to decide now whether the defendant will receive such a commutation or modification at some future date. So far as you are concerned, you are to decide only whether the defendant shall suffer the death penalty or shall be permitted to remain alive under the sentence of life imprisonment without possibility of parole. If upon consideration of the evidence and instructions, you conclude that life imprisonment without possibility of parole is the proper sentence, you must assume that the governor will perform his duty in a correct and responsible manner and will not commute this defendant's sentence unless convinced that he should be eligible for parole and can be safely released into society in a correct and responsible manner. It would be a violation of your duty as jurors if you were to fix the penalty at death because of a doubt that the Governor will properly carry out his responsibilities."

Having considered the matter closely, we cannot agree with the Attorney General that the supplementary charge somehow cured the Briggs Instruction. In our view, that charge does not negate the objectionable language, which continues to mislead: "the instruction would reasonably be understood by the average juror to mean, by negative implication, that while a sentence of life without possibility of parole may be commuted, a sentence of death may not." (*People* v. *Ramos, supra,* 37 Cal.3d at p. 153.)

We do agree, however, that on this record the error was nonprejudicial. As stated above, the court instructed the jurors not to consider "such power by a governor to commute or modify a sentence . . . in determining whether the defendant should be sentenced to death or life imprisonment without possibility of parole." The court thus directed the jurors to make no use of the Briggs Instruction in choosing the penalty. Jurors are, of course, presumed to follow the instructions given by the court. (E.g., *Delli Paoli* v.

*United States* (1957) 352 U.S. 232, 242 [1 L.Ed.2d 278, 285-286, 77 S.Ct. 294].) We find no reason to believe that the jurors here failed to discharge their duty. Hence, we conclude the giving of the Briggs Instruction did not amount to reversible error in this case.[5]

## I. *Testimony of Ketcherside and Jailhouse Informers*

■ Defendant contends that the testimony of Ketcherside and the jailhouse informers was so inherently unreliable that the imposition of the death penalty in this case violated the Eighth Amendment and the due process clause of the Fourteenth Amendment. The point is without merit. The testimony in question—although not proof against challenge —was certainly not without value. Moreover, the jury was fully capable of determining its value, and of accepting it to the extent it was worthy of belief and of rejecting it to the extent it was not.

## J. *Constitutionality of 1978 Death Penalty Law*

Defendant contends the 1978 death penalty law is unconstitutional on various grounds. We rejected the same point in *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113].

## K. *Double Jeopardy*

■ Defendant contends the double jeopardy clauses of the federal and state Constitutions bar imposition of the sentence of death in this action. He argues in substance that the constitutional guaranty prohibits imposition of the death penalty in a later proceeding after a penalty less than death was imposed in an earlier proceeding on substantially the same facts; and he asserts that his prior conviction for murdering Diana Bazargani was predicated on substantially the same facts yet resulted in the lesser penalty of life imprisonment without possibility of parole.

The point is untenable. The federal and state double jeopardy clauses prohibit only multiple prosecutions "for the same offense." As defendant impliedly concedes, the earlier prosecution for the murder of Bazargani and the present prosecution for the murder of Kelley concern *different* offenses. The rule is well settled: "the murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and . . . a conviction or acquittal in one case does not bar a prosecution in

---

[5] Defendant claims that the supplementary charge was itself confusing and misleading. But understanding it as would a reasonable juror, we believe that the charge clearly and correctly directed the jurors away from considerations raised by the Briggs Instruction and back to the proper conduct of their task.

the other." (*People v. Majors* (1884) 65 Cal. 138, 146-147 [3 P. 597].) That substantially the same evidence may have been presented in each trial is therefore immaterial.[6]

## L.  *Intracase Proportionality*

██  Defendant contends that the Constitution is violated because he was sentenced to death and Ketcherside suffered no penalty. Unless the state's capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner, the fact that such defendant has been sentenced to death and others who may be similarly situated have not does not establish disproportionality violative of constitutional principles. (*McCleskey v. Kemp* (1987) 481 U.S. 279, 306-312 [95 L.Ed.2d 262, 287-291, 107 S.Ct. 1756, 1774-1777].) Defendant attempts to make the required showing by arguing in substance that Ketcherside was at least as culpable as he, yet was granted immunity in return for his testimony. His attempt is unsuccessful. The prosecution could have considered—and evidently did—that defendant was more culpable because he was about 40 years old at the time of the crimes while Ketcherside was only about 16, and because he was the leader in developing and executing the criminal plan while Ketcherside was essentially a follower. ██ ██ ██ ██ Accordingly, we cannot conclude that the capital punishment system operated in this case in an arbitrary and capricious manner.[7]

The judgment is affirmed.

Lucas, C. J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

---

[6] Accordingly, we deny defendant's request to take judicial notice of the record in the Bazargani trial.

Defendant may perhaps also be understood to claim that even if the state did not violate the guaranty against double jeopardy by "run[ning] the exact same set of facts by two different juries before [it was] able to get a verdict of death," it nevertheless denied him his right to due process of law. Such a point would be without merit. (*Ciucci v. Illinois* (1958) 356 U.S. 571 [2 L.Ed.2d 983, 78 S.Ct. 839].)

[7] The jury's verdict on the felony-murder-rape special circumstance implies a finding that defendant either actually killed Kelley or acted with intent to kill her in the perpetration of the rape. (See part III A, *ante.*) Accordingly, the imposition of the penalty of death on defendant does not violate the Eighth Amendment. (*Cabana v. Bullock* (1986) 474 U.S. 376, 386 [88 L.Ed.2d 704, 716-717, 106 S.Ct. 689].)

Defendant requests that we take judicial notice of various items in the record on appeal in *People v. McLain,* A013511, appeal pending, for various purposes. (See also fns. 1 & 6, *ante.*) Because none of these items is relevant to any of the issues addressed herein, we deny the request.

**BROUSSARD, J.**—I concur under the compulsion of *People* v. *Hamilton* (1988) 45 Cal.3d 351, 375-376 [247 Cal.Rptr. 31, 753 P.2d 1109].

Appellant's petition for a rehearing was denied September 29, 1988.